# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **JULIAN LECRAW, JR.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| | ) **CIVIL ACTION** |
| **THE ANTIQUE WINE COMPANY** | ) |
| **(FRANCHISING) LIMITED, THE** | ) **FILE NO.** _____ |
| **ANTIQUE WINE CO. (HOLDINGS)** | ) |
| **LIMITED, AWC GLOBAL PLC, and** | ) |
| **STEPHEN WILLIAMS,** | ) |
| | ) |
| **Defendants.** | ) |

## COMPLAINT

COMES NOW Julian LeCraw, Jr. ("LeCraw" or "Plaintiff"), and as his Complaint,

respectfully shows the Court as follows:

### PARTIES, JURISDICTION AND VENUE

1.

LeCraw is a citizen of the United States and the state of Georgia.

2.

Defendant Antique Wine Company (Franchising) Limited ("AWC") is a Private Limited Company incorporated in England with its registered office located in London, England at Quadrant House, Floor 6, 4 Thomas More Square, London, England, E1W 1YW.  AWC is a wine merchant that buys and sells wine in more than 100 countries including the United States of America (including Georgia).  AWC has consigned wine, bought wine from, and sold wine to, LeCraw over the last 10 years.

3.

Defendant AWC Global PLC ("AWC Global") is a Public Limited Company incorporated in England with its registered office located in London, England at 5Th Floor St. George's House, 15 Hanover Square, London, England W1S 1HS.  AWC Global is a wine merchant that buys and sells wine in more than 100 countries including the United States of America (including Georgia).  AWC Global has consigned wine, bought wine from, and sold wine to, LeCraw.

4.

Defendant Antique Wine Co. (Holdings) Limited ("AWC Holdings") is a Private Limited Company incorporated in England with its registered office located at 86 Clifton Road, Ruddington, Nottingham, Notts NG11 6DE.  AWC Holdings is a wine merchant that buys and sells wine in more than 100 countries including the United States of

America (including Georgia).  AWC Holdings has consigned wine, bought wine from, and sold wine to, LeCraw.  According to the Intellectual Property Office of the United Kingdom's website, AWC Holdings is the owner of the trademark "Antique Wine Company" which mark has been used by all Defendants in their dealings with LeCraw.

5.

Defendant Stephen Williams ("Williams," and together with AWC, AWC Global, and AWC Holdings, the "Defendants") is the founder, CEO and Managing Director of AWC, AWC Global, and AWC Holdings.  Williams is a citizen of England and resides in or around London.   Williams and his companies may be served with process in accordance with the Hague Convention.  All Defendants operate their wine businesses from their offices located at 53 Queen Anne Street, London W1G 9JR and may be served through Williams there as he has advised/requested in pre-suit correspondence.  Williams has consigned wine, bought wine from, and sold wine to, LeCraw for more than 10 years.

6.

According to Williams' statements in the AWC Chairman's Report for the year ended October 31, 2012, AWC's profit margin became eroded, which had an adverse effect upon reserves which was "resolved" in the first half of 2013 when AWC was acquired by AWC Global.  According to Defendants' website, the company was originally established by Williams as "The Antique Wine Company" but "[i]n 2013

3

AWC's trading entities were amalgamated to form AWC Global."  Defendants' website indicates that Defendants are now conducting business through AWC Global, including offering some of LeCraw's wine for sale by and through AWC Global.

7.

This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiff is a citizen of the United States and the state of Georgia and the Defendants are citizens or subjects of a foreign state and not lawfully admitted for permanent residence in the United States.  In addition, the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8.

This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because at least one of the claims arises under the laws of the United States.  The Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367 because all of the claims arising under state law are so related to the federal question claim that they form part of the same case or controversy under Article III of the United States Constitution.

9.

This Court has personal jurisdiction over each of the Defendants.  Defendants, by and through Williams and other employees and agents, conduct regular business in the

United States and, according to their website, manage a network of offices, storage facilities and expert advisors across Europe, Asia and North America. Defendants market, sell, and buy wine within the state of Georgia, including the wine that is the subject of this action. Defendants have transacted business within Georgia, and as described below, have committed tortious acts which have caused injury to LeCraw in Georgia.

10.

In fact, Williams and other AWC representatives have traveled to Atlanta, Georgia on Defendants' business, they have inspected wine in Plaintiff's Atlanta cellar, Williams has stayed in Plaintiff's Atlanta home as a guest in connection with some of Plaintiff's purchases of wine from Defendants as alleged herein, he performed wine tastings at Plaintiff's house, and he has delivered and received shipments of wine from Plaintiff's house in Atlanta.

11.

Venue is proper in this District and Division under 28 U.S.C. § 1391(b) and 1391(c)(3).

20297740 v3

## FACTS

**1)      Defendants are experts in fine, vintage and rare wine.**

12.

This action arises out of Defendants' sales to LeCraw of counterfeit bottles of supposedly vintage wine as well as Defendants' failure to pay LeCraw and refusal to account for their consignment sales of other bottles of LeCraw's wine.

13.

LeCraw has enjoyed collecting and entertaining with fine and rare wine.  LeCraw has purchased numerous bottles of wine from Defendants, including a then-record setting purchase of "the world's most expensive bottle of white wine."  Defendants have also sold certain bottles of LeCraw's wine on consignment.  Defendants are still in possession of several of LeCraw's bottles of wine and currently have them listed for sale on Defendants' website.  Defendants have recently admitted owing LeCraw more than $100,000 for unpaid consignment sales.

14.

Defendants operate a vintage, rare and fine wine business based in London. Defendants have offices in London, Hong Kong, and the Philippines.  Defendants actively seek joint venture partners in other regions including China and Russia.

Defendants boast of a "massive inventory," marketing support, industry knowledge and "direct access to limited allocation wines."

15.

Defendants boast that they supply fine wine to private individuals, hotels, restaurants, and the global wine trade.  They claim to be internationally recognized as experts in the fine wine industry, and they routinely manage, provide advice on and actively support wine cellars that are held in chateaux, palaces, grand hotels and exclusive, private residences worldwide.

16.

Defendants operate "AWC Estates" which they describe as a discrete consultancy that performs wine related property search, evaluation and transactional support services matching sophisticated clients from around the world with the finest vineyards and estates on the market.

17.

Defendants also operate the "AWC Wine Academy" from which they offer "accredited courses" for wine professionals and amateurs, tutored and themed wine tasting events, with "experts" who can help clients design their own private wine tasting event.

7

18.

Defendants, through the Antique Wine Company brand, offer services in fine wine sales, fine wine purchasing, wine consignment, cellar management, cellar design, cellar insurance, shipping, and wine storage, among other things.  Defendants claim to be "one of the world's foremost wine merchants" and claim that Williams, the founder, CEO and Managing Director, is one of the world's leading experts on fine and rare wine, and has more than 45,000 clients in more than 100 countries.

19.

In fact, Defendants tout that they are the "leading fine wine merchant actively championing wine authentication."  Defendants also tout that they opened an office in Bordeaux to sponsor the CEBG Bordeaux Centre for Nuclear Studies which researches fine wine provenance with ion beam analysis to verify the age of the glass bottles and wine contained therein.

20.

Defendants' website lists Mr. Williams' three "landmark achievements," one of which was the "record-breaking sale of the world's most expensive white wine, Chateau d'Yquem 1787, for $100,000" (the "1787 d'Yquem Sale").  As discussed below, the 1787 d'Yquem Sale was to Plaintiff (although the price was actually $90,000 plus various transactional costs).

**2)      LeCraw's purchases of supposedly vintage wine from Defendants.**

21.

Plaintiff began purchasing vintage, rare, and other valuable wine from Defendants in the early 2000s.   Defendants held themselves out as one of the world's leading authorities on vintage and high-end wine and the value of it.  Plaintiff believed Williams to be the vintage wine expert that he held himself out to be, and relied on his expertise and superior wine knowledge in every transaction with Defendants.   In fact, Plaintiff would not have purchased wine from Defendants if he did not believe they are the fine wine experts they claim to be.

22.

LeCraw purchased the 1787 d'Yquem from Defendants in January 2006 for $90,000, plus $1,400 for insurance.  Williams told LeCraw that the grapes used in the 1787 d'Yquem were picked before George Washington was elected as the first United States President.

23.

Williams personally delivered the 1787 d'Yquem to LeCraw's Atlanta home on or around February 13, 2006.   As he did on other occasions while in Atlanta, Williams stayed as a guest in LeCraw's home.   He even conducted a wine tasting at LeCraw's

9

home for LeCraw and some of Atlanta's wine enthusiasts who came to see the prized 1787 d'Yquem.

24.

Defendants sought and received substantial publicity for the 1787 d'Yquem Sale to enhance their own credibility as global vintage wine merchants.  LeCraw did not want the publicity and insisted on remaining anonymous in the 1787 d'Yquem Sale.  At LeCraw's request, he was never identified as the buyer in the vast media coverage initiated by Defendants.  Defendants still tout this sale on their website.

25.

In connection with the 1787 d'Yquem Sale, Defendants provided LeCraw with a leather notebook embossed with the Antique Wine Company logo.  The leather notebook contains, among other things, Defendants' February 9, 2006 letter signed by Williams describing the alleged history and provenance of the 1787 bottle (although the letter has a typographical error describing it as vintage 1784).

26.

The notebook also contains numerous press clippings gathered by Williams as a result of his efforts to obtain the greatest possible publicity for the 1787 d'Yquem Sale to LeCraw.

27.

In connection with Defendants' effort to publicize the 1787 d'Yquem Sale, the media reported that Williams was flying to Atlanta from England on his private jet to personally deliver the 1787 bottle of d'Yquem to an "anonymous American billionaire."[1] Williams insisted that it was all part of his "highly personal service," and was quoted as saying, "It might be the most expensive and pampered travelling companion I have ever had, but at £10,000 a glass, I have to be sure that our client is left with a sweet taste in his mouth." True and correct copies of the February 9, 2006 letter, plus the press clippings gathered and provided by Defendants to Plaintiff in the leather Antique Wine Company notebook in connection with the 1787 d'Yquem Sale are attached hereto collectively as Exhibit "A" and incorporated herein.

28.

The leather notebook also contains a fax letter to Williams from Hardy Rodenstock commenting on the 1787 d'Yquem. Williams included the Rodenstock letter to corroborate the provenance and authenticity of the alleged 1787 bottle. Rodenstock was initially a famous wine connoisseur, but has been discredited and publicly accused of being a major wine counterfeiter and is in hiding. A true and correct copy of the

---

[1] LeCraw is not and has never been a "billionaire." Williams' description of him as a billionaire (as well as other hyperbolic statements about the Sale) was Williams' effort to further the mystique of the 1787 d'Yquem Sale for Defendants' benefit.

11

Rodenstock letter from the leather Antique Wine Company notebook is attached hereto as Exhibit "B," and incorporated herein.

29.

Defendants sold LeCraw other bottles of allegedly vintage wines.  Between March and June 2006, Defendants sold LeCraw the following 12 bottles of Chateau Lafite (some of which would be Chateau Lafite Rothschild and some of which would have predated the Rothschild family ownership of the Chateau) which LeCraw still owns and possesses:

        1784 Chateau Lafite Rothschild 750ml
        1789 Chateau Lafite Rothschild 750ml
        1791 Chateau Lafite Rothschild 750ml
        1800 Chateau Lafite Rothschild 750ml
        1815 Chateau Lafite Rothschild 750ml
        1846 Chateau Lafite Rothschild 1.5L
        1848 Chateau Lafite Rothschild 1.5L
        1889 Chateau Lafite Rothschild 750ml
        1894 Chateau Lafite Rothschild 750ml
        1894 Chateau Lafite Rothschild 750ml
        1898 Chateau Lafite Rothschild 750ml
        1906 Chateau Lafite Rothschild 1.5L

These bottles are hereinafter referred to as the "Lafites."

30.

Defendants also sold LeCraw a 1908 Chateau Margaux 6 liter in January 2006 (the "1908 Margaux").  Defendants claimed to have purchased the 1908 Margaux in a castle in Austria.

12

31.

Defendants also sold LeCraw a bottle of 1847 Chateau d'Yquem 750ml after October 2007 (the "1847 d'Yquem").  The 1847 d'Yquem bears a sticker that was placed on the bottle by Defendants stating that Defendants and the chateau had inspected the bottle in October 2007.  Defendants' sticker provides details about the 1847 d'Yquem's alleged provenance and why the bottle is supposedly authentic.  A copy of a photograph of the back side of the 1847 d'Yquem with Defendants' sticker is attached hereto as Exhibit "C," and incorporated herein.

**3)   LeCraw discovers that Defendants sold him counterfeit wine.**

32.

In early 2013, a wine merchant visited LeCraw's cellar to determine whether he wished to purchase some of LeCraw's bottles or offer them at auction.  The merchant questioned the authenticity of the 1787 d'Yquem and other bottles, including some of the Lafites.  The merchant recommended that LeCraw have a wine authentication expert inspect various bottles in his cellar.

33.

In March 2013, LeCraw began discussions with Maureen Downey of Chai Consulting, a well-known wine authentication expert located in San Francisco,

California.  LeCraw contacted Ms. Downey to inspect bottles in his cellar to determine whether they are counterfeit.

34.

Ms. Downey recently testified in the high-profile trial in New York in March and April 2013 where billionaire Bill Koch sued Eric Greenberg for "wine fraud" for knowingly selling counterfeit wine which Koch ultimately purchased.   Mr. Koch obtained a jury verdict against Mr. Greenberg for more than $12.3 million in connection with the sale of fake wine (although later reduced).   *See William I. Koch v. Eric Greenberg, et al.*, United States District Court, Southern District of New York, Civil Action No. 07-CIV-9600, filed October 26, 2007.

35.

After testifying in the Koch trial, in April 2013, Ms. Downey traveled to Atlanta and inspected bottles in LeCraw's cellar.  Ms. Downey and her photographer spent two full days inspecting and photographing bottles in LeCraw's cellar and Ms. Downey determined that many were fake.

36.

Ms. Downey issued a report in June 2013 (the "Downey Report") which opines that all of the Lafites, the 1908 Margaux, the 1847 d'Yquem, and the prized 1787 d'Yquem are all counterfeits (the "Fake Wine").

14

37.

The Downey Report explains why each bottle of Fake Wine is not what it purports to be.  For instance, on some of the bottles that are supposedly centuries old, the labels were printed by computer.  Others show excess glue around the labels which could not have been used by the chateaux.  Other indicia of counterfeiting relates to the corks, the capsules, the sediment inside the bottle, the shape and color of the bottle, and the color of the liquid in the bottle, among other things.

38.

After receiving the Downey Report, LeCraw, through counsel, provided relevant portions of the Downey Report to Defendants and made demand on Defendants with respect to the counterfeit wine, among other things described hereinbelow.

39.

In a series of written communications following LeCraw's initial demand, Defendants, through counsel, refused LeCraw's demands and denied that the Fake Wine is counterfeit.

40.

Although the Downey Report provided detailed and irrefutable evidence that each of the bottles of the Fake Wine is not authentic, Defendants attacked Downey's methodologies and refused to acknowledge that the Fake Wine is fake.   Thus, because

15

Defendants continued to deny that the Fake Wine is fake in the face of irrefutable evidence of counterfeiting, LeCraw was forced to submit the Fake Wine to the respective chateaux in France for the definitive word on whether the bottles are genuine.

41.

On March 19, 2014, LeCraw had the 1787 d'Yquem and the 1847 d'Yquem presented to the senior management of Chateau d'Yquem at the chateau in Sauternes, France for inspection.   Consistent with the Downey Report, Chateau d'Yquem's management concluded that both the 1787 d'Yquem and the 1847 d'Yquem are not authentic Chateau d'Yquem.

42.

On March 20, 2014, LeCraw had the Lafites presented to the senior management of Chateau Lafite Rothschild for inspection at the chateau in Pauillac, France.   For logistical reasons related to customs, duties and tariffs, four of the 12 Lafites did not travel to France, although they were presented to the chateau for inspection in high-definition photographs on a laptop computer.   The other eight Lafites were presented for the in-hand inspection by the chateau.

43.

Consistent with the Downey Report, Chateau Lafite Rothschild's management concluded that each of the Lafites are not authentic Chateau Lafite or Chateau Lafite

16

Rothschild.[2]   The Directeur des Domaines of Chateau Lafite Rothschild declared all of the Lafites to be "FAUX, FAUX, FAUX."

44.

LeCraw decided not to incur the cost of transporting the 1908 Margaux to France because of its large size and because it is objectively fake.

45.

Chateau d'Yquem having confirmed that the d'Yquem bottles in the Fake Wine are not genuine, and Chateau Lafite Rothschild having confirmed that the Lafites are not genuine, it is indisputable that each bottle of the Fake Wine sold by Defendants to LeCraw is counterfeit and completely worthless and unmarketable.

46.

Defendants are renowned and self-described experts in the fine and rare wine industry, and they boast of being on the cutting edge of rare wine authentication. Williams has held himself out as a wine expert since he met LeCraw.  Williams and his companies told LeCraw that each of the bottles of Fake Wine was authentic and genuine, but as fine and rare wine experts who supposedly researched and guaranteed the

---

[2] The bottle purporting to be an 1889 Chateau Lafite Rothschild does not purport to be a Chateau-bottled wine.  Thus, the chateau could not have an official opinion on this particular bottle although the chateau management present at the March 20, 2014 meeting believed the bottle to be fake.

20297740 v3

provenance and histories of each bottle sold, they knew that all of the Fake Wine was counterfeit when they sold it to LeCraw.

47.

In fact, if Williams is truly one of the world's foremost experts on fine wine as he says, and as the founder, CEO, and Managing Director of AWC which is one of the "world's leading experts on fine and rare wine" as Defendants claim, then it would be impossible for Defendants not to know that the Fake Wine they were selling to LeCraw is counterfeit. Defendants knew the Fake Wine was not authentic before selling it to LeCraw, and Defendants' ongoing and unsupported refusal to acknowledge that it is counterfeit is part of their scheme to conceal the fraud.

48.

According to Downey and the chateaux, there are numerous reasons that each of the bottles of Fake Wine are known to be counterfeit. Although an expert wine merchant such as Defendants might not know one or two of the tell-tale signs of counterfeiting on a given bottle, each bottle of the Fake Wine has several indicia of counterfeiting.

49.

Moreover, Defendants claim that they are actively working to root out fraud in the vintage wine industry and are on the forefront of authentication techniques. An expert

18

wine merchant like Defendants would know, for example, that most of the corks in the Fake Wine are too short to have come from the respective chateaux.

50.

Similarly, many of the Lafite bottles have rebouche tags on them which purport to evidence the year in which Chateau Lafite Rothschild supposedly re-corked the bottle at the chateau.   The rebouche tags on several of the Lafites contain the Chateau Lafite Rothschild logo which shows the letter R through which there are five arrows inside a circle around which the words *"Domaines Barons De Rothschild"* appear, as follows:



51.

These Lafite rebouche stickers state that the re-corking occurred at Chateau Lafite Rothschild in various years between 1979 and 1983.   However, Chateau Lafite Rothschild did not use the logo with the five arrows until 1988.   Chateau Lafite Rothschild could not have placed these rebouche tags on these bottles in 1979 to 1983 because that logo did not yet exist.   The counterfeiter made a sloppy mistake and

19

Defendants, the fine wine experts, repeatedly turned a blind eye to this glaring sign of counterfeiting that they would certainly be aware of.

52.

Similarly, Defendants placed their own sticker on the 1847 d'Yquem which states that AWC presented the bottle to Comte Alexandre Lur-Saluces of Chateau d'Yquem for inspection in October 2007.  <u>See</u> Exhibit "C."  However, Chateau d'Yquem confirmed that Mr. Lur-Saluces left Chateau d'Yquem in 2004.  Therefore, Mr. Lur-Saluces could not have inspected the bottle for Chateau d'Yquem in 2007.  Defendants' statement appearing on the very bottle sold to LeCraw which purports to represent that AWC traveled to Bordeaux to inspect the bottle with Mr. Lur-Saluces in October 2007 was knowingly false when Defendants made this bold misrepresentation.

53.

Aside from their superior expertise in fine and rare wine and the numerous signs of counterfeiting on each of the bottles, Defendants' knowledge that the Fake Wine was counterfeit is further evidenced by Defendants' refusal to take it back and sell it for LeCraw despite numerous requests between 2009 and 2012.  LeCraw told Williams on numerous occasions that he wished to sell his vintage collection and was willing to take a loss on the wines.

54.

Williams' knowledge that the Fake Wine was counterfeit is especially evidenced by the fact that Williams took hundreds of bottles of LeCraw's wine on consignment but would not consign the Fake Wine which Defendants sold to LeCraw even when Williams knew that LeCraw was highly motivated to sell the bottles and willing to sell at a loss.

55.

Williams paid lip service to LeCraw that he was trying to find buyers for some of the Fake Wine as it remained in LeCraw's cellar in Atlanta, but Williams never presented a buyer or offer and he refused to take possession of the Fake Wine on consignment. This was during the same time that Defendants were taking hundreds of other bottles of LeCraw's wine to sell on consignment. The Fake Wine obviously only had a market if it was not counterfeit, and Defendants having sold the Fake Wine to LeCraw, they knew it was fake and not valuable and marketable.

56.

Defendants' website plainly states "We want to buy your wines." Yet, Defendants refused to take even the prized 1787 d'Yquem which Defendants had earlier sold to LeCraw in a record-setting transaction that they widely publicized to gain notoriety for themselves. Again, LeCraw told Defendants that he would sell at a loss but Williams would not even take it on consignment.

21

57.

With the benefit of hindsight, it is clear that at the same time Defendants were willing to take scores of bottles of LeCraw's wine on consignment, they refused to take the Fake Wine because as LeCraw's source of the Fake Wine, Defendants knew it was not authentic.

58.

In fact, in January 2012, Williams evidently had a potential transaction for a buyer who wanted to buy a bottle of 1847 d'Yquem.  Williams knew he had sold such a bottle to LeCraw but could not recall which 1847 bottle he had sold to LeCraw.  Williams emailed LeCraw on January 7, 2012 asking LeCraw to check his 1847 d'Yquem to see whether it had an Antique Wine Company sticker with the exact wording reproduced in his email.

59.

LeCraw confirmed to Williams that his 1847 d'Yquem bottle did indeed contain the AWC sticker.  See Exhibit "C."  The presence of the sticker on LeCraw's 1847 bottle evidently confirmed to Williams that LeCraw had the counterfeit 1847 d'Yquem that Williams had sold to him.  Thus, Williams did not ask LeCraw to sell it to Williams' buyer and Williams evidently sold the other bottle of 1847 he knew to be genuine.

**4)   Defendants take millions of dollars of LeCraw's wine on consignment and fail to account for it or pay for all of it.**

60.

In 2010, Defendants agreed to consign numerous bottles of LeCraw's wine for sale including large format bottles such as magnums, jeroboams, imperials, and one-of-a-kind bottles such as 5 liters and 18 liters.  Defendants had more than 200 bottles shipped from LeCraw's cellar in Atlanta to the Antique Wine Company in London for sale on consignment.

61.

Of the wine shipped to Defendants on consignment, there were numerous bottles of different vintages of d'Yquem owned by a wine investment club to which LeCraw belonged (the "d'Yquem Vertical").  This lawsuit does not pertain to the d'Yquem Vertical.  The other bottles taken by Defendants on consignment are referred to herein as the "Consigned Wine."

62.

Defendants periodically paid LeCraw by wire transfer various amounts for sales of the Consigned Wine between September 2010 and July 2011.  However, the total amount wired to LeCraw is a fraction of the value of the Consigned Wine.

23

63.

LeCraw has made numerous requests and demands that Defendants provide an inventory and accounting of the Consigned Wine, but Defendants have stalled, digressed, and generally failed and refused to do so.    Instead, Defendants have provided unsupported assertions about amounts paid to LeCraw and they have refused to provide sales records, invoices, transactional documents, or specifics about their sales and payments for the Consigned Wine.

64.

Some of LeCraw's Consigned Wine remains offered for sale on Defendants' website.  According to the website, LeCraw's wine is offered for sale by AWC Global.

65.

In response to LeCraw's recent demands about the Consigned Wine, Defendants admitted owing LeCraw $101,000 for sold bottles of Consigned Wine (although the amount is actually much greater), but Defendants have refused to explain or substantiate this amount.    Moreover, Defendants only admitted to this indebtedness after LeCraw hired counsel to investigate and make demand.  Defendants obviously planned to never pay the $101,000 they now admit they owe, and they have still not paid this amount or returned any of the unsold Consigned Wine.

24

66.

LeCraw has not been paid in full for the Consigned Wine, and Defendants are required to account to LeCraw for all of the sales of each bottle of the Consigned Wine. LeCraw is entitled to the full value of the Consigned Wine, plus prejudgment interest, minus commissions of 10% of the sale price per bottle, minus amounts paid to LeCraw in September 2010 through July 2011.  The full value of the Consigned Wine exceeds $3 million.

## COUNT ONE

## BREACH OF CONTRACT (FAKE WINE)

67.

LeCraw incorporates all of the allegations above as if fully set forth herein.

68.

Defendants are in breach of their contracts with respect to the Fake Wine by selling counterfeit bottles to LeCraw.

69.

Although Defendants contracted to sell LeCraw genuine and authentic wine, the Fake Wine is counterfeit.  LeCraw did not discover, and could not have discovered, that the Fake Wine was counterfeit until June 2013 and/or March 2014.  LeCraw was diligent

25

at all times with respect to the Fake Wine and retained a wine authentication expert immediately upon having reason to know the Fake Wine was not authentic.

70.

Defendants concealed that the Fake Wine was counterfeit, and made and continue to make misrepresentations that the Fake Wine is genuine.  Defendants' actions were intended to and have prevented LeCraw from discovering that the Fake Wine is counterfeit.  LeCraw had to present the Fake Wine to the chateaux in Bordeaux, France at great cost just to confirm what Ms. Downey had already determined -- the Fake Wine is "FAUX, FAUX, FAUX."

71.

Defendants' breaches of contract for each of the sales of the bottles of Fake Wine have caused LeCraw substantial damages for which Defendants are liable, jointly and severally, in an amount to be determined at trial.

## COUNT TWO

## BREACH OF EXPRESS AND IMPLIED WARRANTIES

72.

LeCraw incorporates all of the allegations set forth above as if fully set forth herein.

20297740 v3

73.

Defendants gave express warranties under the Uniform Commercial Code that the Fake Wine was authentic and had the provenance and vintages as represented by Defendants and shown on each of the bottles.  Defendants not only told LeCraw that the bottles were genuine and of the vintage and producer indicated on each of the bottles, the bottles themselves contain the express warranties of their vintage and producer.

74.

Defendants also gave the implied warranties under Uniform Commercial Code § 2-314 that the Fake Wine was merchantable and fit for the ordinary purpose for which each bottle was being purchased.

75.

The implied warranty of merchantability also included that the Fake Wine conformed to the promises and affirmations of fact made by Defendants to LeCraw that the bottles were authentic.

76.

Defendants also gave the implied warranty under Uniform Commercial Code § 2-315 that the Fake Wine was fit for LeCraw's particular purpose.  Defendants knew that LeCraw was purchasing fine wines for the purpose of creating one of the best and most exclusive wine cellars in the world, which necessarily required that the bottles be

27

authentic.  Defendants also knew that LeCraw was relying on Defendants' skill and judgment to select and furnish the wine for LeCraw's specific needs.

77.

The Fake Wine sold by Defendants to LeCraw is counterfeit.  The Fake Wine was non-conforming and breached Defendants' express and implied warranties.

78.

Defendants' breaches of the express and implied warranties of merchantability and fitness for a particular purpose have caused LeCraw substantial actual, incidental, and consequential damages for which Defendants are liable, jointly and severally, in an amount to be determined at trial, plus pre-judgment interest.

## COUNT THREE

## BREACH OF WARRANTIES UNDER THE MAGNUSON-MOSS ACT

79.

LeCraw incorporates all of the allegations set forth above as if fully set forth herein.

80.

Defendants are warrantors within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(5).

81.

The Fake Wine is a "consumer product" within the meaning of the Magnuson-Moss Act because it is normally used for personal, family, or household purposes.

82.

LeCraw is a consumer as defined by the Magnuson-Moss Act.

83.

As part of the sales of the Fake Wine to LeCraw, Defendants made representations about the Fake Wine and assured LeCraw that it was authentic.  Defendants also represented to LeCraw that the Fake Wine was rare and valuable because of its vintage.

84.

An implied warranty within the meaning of the Magnuson-Moss Act arose by operation of law as part of the transactions.

85.

The Fake Wine was not merchantable at the time of sale within the meaning of the Magnuson-Moss Act because it is counterfeit.

86.

Defendants' breaches of warranty constitute a violation of 15 U.S.C. § 2310(d).

20297740 v3

87.

As a result of Defendants' violations of the Magnuson-Moss Act, LeCraw has suffered substantial actual, incidental, and consequential damages for which Defendants are liable, jointly and severally, in an amount to be determined at trial, plus pre-judgment interest.  LeCraw is also entitled to attorney's fees and costs under the Magnuson-Moss Act.

## COUNT FOUR

## FRAUD

88.

LeCraw incorporates all of the allegations set forth above as if fully set forth herein.

89.

Defendants intentionally and knowingly made misrepresentations of fact regarding the authenticity and provenance of the Fake Wine.  Defendants also concealed and suppressed material facts from LeCraw with respect to the Fake Wine.  Such misrepresentations included that the Fake Wine was authentic as to the vintage and producer shown on the labels on the bottles themselves.  Defendants concealed the material fact that the Fake Wine was counterfeit.

30

90.

The misrepresentations and omissions by Defendants went to the essence of the transactions with the Fake Wine.  The Fake Wine was purchased with the paramount assumption and condition that each bottle was genuine from the respective châteaux in the years shown on the labels.

91.

For the reasons explained above, Defendants knew the Fake Wine was counterfeit at the time of the sales to LeCraw.  Alternatively, at a minimum, Defendants -- who said they were experts in fine and rare wines and authentication of wine -- acted with a complete reckless disregard for the truth or falsity of their representations about the authenticity of the Fake Wine by turning a blind eye to all of the indicia of counterfeiting.

92.

Defendants' misrepresentations and omissions were made with the purpose and knowledge that LeCraw would rely on those statements and with the intent to induce LeCraw to rely on those statements to purchase the Fake Wine.

93.

Defendants intended that LeCraw rely on their wine expertise and misrepresentations that the Fake Wine was authentic so that they could sell the Fake Wine to LeCraw for substantial profits.  Knowing that the Fake Wine was not authentic,

31

Defendants needed a buyer like LeCraw who would trust them or else the Fake Wine could not have been sold and Defendants' fraudulent scheme would have been revealed.

94.

Defendants held themselves out as fine and rare wine experts, including the authentication of fine and rare wines. Defendants continue to tout their wine authentication expertise to this day and they intend that all of their customers, including LeCraw, rely on their expertise in their sales of wine. LeCraw had relied on Defendants' expertise and standing in the fine wine industry for many years before purchasing the Fake Wine and had no reason to suspect the Fake Wine was counterfeit.

95.

LeCraw did not know that the Fake Wine was counterfeit, as demonstrated by the exorbitant prices he paid to Defendants for what were worthless bottles of unknown liquid. LeCraw had no reason to question the authenticity of the Fake Wine which was represented and warranted by Defendants to be genuine.

96.

Defendants are international wine merchants who regularly deal in vintage, fine and rare wines. LeCraw reasonably and justifiably relied on Defendants' misrepresentations and omissions about the Fake Wine in connection with each of LeCraw's purchases of the Fake Wine.

97.

At the time LeCraw purchased the Fake Wine and up until June 2013, LeCraw was unaware that the Fake Wine was counterfeit.  LeCraw did not know for certain that the Fake Wine was counterfeit until March 2014 when the chateaux confirmed Ms. Downey's opinions that all of the Fake Wine is counterfeit.

98.

LeCraw had no reason to know the Fake Wine was counterfeit until early 2013.  In all communications with Defendants before and after purchasing the Fake Wine, Defendants concealed that the Fake Wine is counterfeit.  LeCraw would not have purchased the Fake Wine if he knew or had any reason to believe it was counterfeit at the time he purchased it.  Further, Defendants continued their efforts to conceal their fraud through communications leading up to the filing of this Complaint.

99.

LeCraw acted diligent at all times with respect to the discovery of the fact that the Fake Wine was counterfeit.  LeCraw had no reason to doubt the provenance and authenticity of the Fake Wine sold by Defendants until early 2013 when a wine merchant interested in purchasing some of LeCraw's wine called into question the authenticity of the Fake Wine.

100.

Immediately upon being told that some of the wine in his cellar might be counterfeit, LeCraw retained one of the world's foremost experts on wine authentication, Maureen Downey.  Ms. Downey inspected the Fake Wine and issued the Downey Report in June 2013 confirming that the Fake Wine is counterfeit.

101.

When Defendants denied the accuracy of the Downey Report and continued to maintain that the Fake Wine is genuine, LeCraw had to get the bottles to the chateaux for the definitive word on authenticity.  Therefore, it was not until June 2013 or March 2014 that LeCraw could have known that the Fake Wine was counterfeit.

102.

Each of the bottles of Fake Wine purchased by LeCraw is worthless.  As a result of LeCraw's reliance upon Defendants' misrepresentations and omissions, LeCraw suffered actual damages in an amount to be determined at trial for which Defendants are liable, plus punitive damages and attorney's fees.  LeCraw's damages caused by Defendants also include pre-litigation expenses and attorney's fees flowing from Defendants' fraud, including the substantial expenses incurred engaging a wine authentication expert to inspect the Fake Wine and transporting the Fake Wine to the chateaux to confirm the

Fake Wine is counterfeit (which was necessitated by Defendants unsupported refusal to acknowledge the conclusions of the Downey Report).

## COUNT FIVE

## CONSPIRACY TO DEFRAUD

103.

LeCraw incorporates all of the allegations set forth above as if fully set forth herein.

104.

In addition to Defendants' fraudulent conduct as set forth in Count Four of this Complaint, Defendants conspired to defraud LeCraw by selling the Fake Wine and then conspired to conceal the fraud.  Defendants had a positive or tacit understanding that they would act in concert to defraud LeCraw to purchase the Fake Wine, and then do everything possible to preserve their fraudulent result by concealing and covering up the fraud.

105.

Williams, AWC, and AWC Holdings initially conspired to defraud LeCraw in connection with the sale of the Fake Wine.   They acted in concert and made misrepresentations of fact regarding the authenticity and provenance of the Fake Wine to induce LeCraw to purchase each of the bottles at exorbitant prices.  They also concealed

20297740 v3

and suppressed material facts from LeCraw with respect to the Fake Wine. Such misrepresentations included that the Fake Wine was authentic as to vintage and producer, and as represented on the bottles themselves. They concealed the material fact that the Fake Wine was counterfeit.

106.

In addition, after LeCraw brought the Fake Wine to Defendants' attention and continuing through correspondence leading up to the filing of this Complaint, Defendants all acted in concert in an effort to conceal the fraud and their respective corporate identities.

107.

As a result of LeCraw's reliance upon Defendants' actions in furtherance of their conspiracy to defraud LeCraw, LeCraw suffered actual damages in an amount to be determined at trial for which Defendants are liable, plus punitive damages and attorney's fees. LeCraw's damages caused by Defendants also include pre-litigation expenses and attorney's fees flowing from Defendants' fraud, including the substantial expenses incurred engaging a wine authentication expert to inspect the Fake Wine and transporting the Fake Wine to the chateaux to confirm the Fake Wine is counterfeit (which was necessitated by Defendants unsupported refusal to acknowledge the conclusions of the Downey Report).

36

## COUNT SIX

## NEGLIGENT MISREPRESENTATION

### 108.

LeCraw incorporates all of the allegations set forth above as if fully set forth herein.

### 109.

In connection with their business dealings with LeCraw, Defendants supplied LeCraw with false information about the authenticity and genuineness of the Fake Wine. Defendants also omitted material information from their communications to LeCraw about the authenticity and genuineness of the wine which they had a duty to disclose to LeCraw.

### 110.

In providing said false information and in making said omissions, Defendants failed to exercise reasonable care or competence in obtaining or communicating the information to LeCraw, with the knowledge that LeCraw would rely on said information in connection with his purchases of the Fake Wine.

### 111.

Defendants knew that LeCraw was relying on their knowledge, skill and expertise in fine and rare wine and the authentication thereof.

112.

LeCraw justifiably and reasonably relied on the false information provided by Defendants with respect to the Fake Wine, causing LeCraw substantial pecuniary loss. LeCraw's damages also include pre-litigation expenses and attorney's fees caused by Defendants' misrepresentations, including the substantial expenses incurred engaging a wine authentication expert to inspect the Fake Wine and transporting the Fake Wine to the chateaux to confirm the Fake Wine is counterfeit (which was necessitated by Defendants unsupported refusal to acknowledge the conclusions of the Downey Report).

113.

Defendants are liable, jointly and severally, for LeCraw's pecuniary loss from the purchases of Fake Wine in an amount to be determined at trial, plus pre-judgment interest.

**COUNT SEVEN**

**MONEY HAD AND RECEIVED**

114.

LeCraw incorporates all of the allegations set forth above as if fully set forth herein.

115.

LeCraw paid Defendants substantial amounts for the Fake Wine.  Instead of rare, centuries-old fine wine, LeCraw received worthless glass containing unknown liquids. Defendants were unjustly enriched by LeCraw's payments, LeCraw has been damaged by the payments and, in equity and good conscience, Defendants should not be entitled to retain the purchase prices for the Fake Wine.

116.

Defendants are liable, jointly and severally, to LeCraw in an amount to be determined at trial for money had and received in the amounts paid by LeCraw for the Fake Wine, plus pre-judgment interest from the dates on which each payment for Fake Wine was made.

## COUNT EIGHT

## VIOLATIONS OF THE FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

117.

LeCraw incorporates all of the allegations set forth above as if fully set forth herein.

118.

Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3).

119.

Defendants are a group of entities and individuals which operate as an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

120.

Defendants were each associated with the enterprise, and participated, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962.

121.

Defendants engaged in a pattern of racketeering activity, the activities of which affect interstate and international commerce, to defraud LeCraw and unlawfully enrich themselves.  LeCraw is a victim of Defendants' racketeering activity.  LeCraw relied on Defendants' misrepresentations that the Fake Wine that Defendants exported to the United States and sold to LeCraw was genuine.

122.

Defendants knew that the Fake Wine was counterfeit when they sold each bottle to LeCraw for the reasons detailed above.  LeCraw did not know the Fake Wine was counterfeit and would not have purchased the Fake Wine if Defendants had disclosed the

truth that the wine was counterfeit.

123.

LeCraw paid substantial sums of money for the Fake Wine which is worthless and not what it purports to be on each of the labels.

124.

Defendants' pattern of racketeering activity consisted of numerous violations of the United States mail and wire fraud statues, 18 U.S.C. §§ 1341 and 1343.  Examples of such predicate acts of wire and mail fraud include the marketing, sale, invoicing, payment, shipment and delivery of the Fake Wine.

125.

In the course of, and in furtherance of, this racketeering conduct and Defendants' enterprise, Defendants engaged in wire fraud, in violation of 18 U.S.C. § 1343, by regularly sending faxes and emails and by making phone calls to LeCraw and his agents in furtherance of the enterprise's fraudulent scheme to sell counterfeit wine.  In addition, most if not all of the Fake Wine was paid for by LeCraw by wire transfer to Defendants' bank account, pursuant to Defendants' request.   Defendants knowingly accepted LeCraw's numerous wire transfers totaling many hundreds of thousands of dollars.

41

126.

Prior to and after LeCraw's purchases of the Fake Wine, Defendants communicated with LeCraw by phone, email, facsimile, and in person in Atlanta. In these communications and others, Defendants -- wine experts -- told LeCraw that each of the bottles of Fake Wine was authentic and genuine, despite knowing that the Fake Wine was counterfeit.

127.

Defendants sent invoices to LeCraw by mail, fax, and/or email in connection with the sales of the Fake Wine. The invoices requested payment by wire transfer. LeCraw paid for the Fake Wine by transmitting funds to Defendants by wire transfers.

128.

As a specific example of the numerous acts of wire fraud committed by Defendants in connection with their sales of the Fake Wine, Defendants sent LeCraw Invoice No. FRO910 by email on March 27, 2006 which requested payment for five of the Lafites.

129.

Likewise, Defendants sent LeCraw Invoice No. FRO1063 by email on June 6, 2006 which requested payment for four of the Lafites. Defendants also sent invoices to LeCraw for the other bottles of Fake Wine by means of wire (or mail), each of which represented that the Fake Wine was authentic, and requested payment by wire transfer.

Defendants also sent LeCraw emails marketing the Fake Wine and negotiating the prices leading up to the sales of Fake Wine.

130.

In the course and in furtherance of this racketeering conduct and Defendants' enterprise, Defendants also engaged in mail fraud in violation of 18 U.S.C. § 1341.

131.

Between 2006 and 2009, Defendants regularly and knowingly exported counterfeit wine into the United States.  Defendants knowingly shipped the Fake Wine to LeCraw by mail or private or commercial interstate carrier.  Defendants personally delivered the alleged 1787 d'Yquem to LeCraw in Atlanta, and Defendants shipped the remaining bottles of the Fake Wine to LeCraw by mail or private or commercial interstate carrier.

132.

Defendants committed numerous other predicate acts of wire and mail fraud in furtherance of the enterprise's fraudulent scheme to sell counterfeit wine to LeCraw.

133.

In each instance, Defendants knew the bottles of the Fake Wine were counterfeit. Nevertheless, they intended to and did sell each of the bottles to LeCraw.  Thus, Defendants have committed numerous predicate acts constituting a pattern of racketeering activity.

134.

All of the predicate acts of racketeering activity outlined herein are related to the same or similar purposes, results and participants, and have the same goals, namely the enrichment of Defendants at the expense of LeCraw.  The predicate acts of racketeering also used the same methods of commission and were otherwise interrelated by distinguishing characteristics, and were not isolated incidents.

135.

As a proximate result of Defendants' predicate acts of wire and mail fraud, criminal enterprise, and violation of 18 U.S.C. § 1962, LeCraw has suffered damages, including paying substantial sums for the Fake Wine that was and is worthless. Defendants intended to cause LeCraw to act in reliance upon Defendants' misrepresentations regarding the vintage and producer of each Counterfeit Wine.

136.

By virtue of the above-referenced ongoing scheme and artifice to defraud, Defendants have violated the provisions of 18 U.S.C. § 1962(a)-(c).  In addition, Defendants engaged in the foregoing illegal conduct as part of an unlawful conspiracy designed to defraud LeCraw and subsequently conceal the fraud in violation of 18 U.S.C. § 1962(d).

137.

Defendants' violations of 18 U.S.C. § 1962 have directly and proximately caused injury and financial loss to LeCraw.

138.

For their violations of RICO, Defendants are liable, jointly and severally, to LeCraw in an amount to be determined at trial, including treble damages under 18 U.S.C. § 1964(c), plus pre-judgment interest.

## COUNT NINE

## VIOLATIONS OF THE GEORGIA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

139.

LeCraw incorporates all of the allegations set forth above as if fully set forth herein.

140.

Defendants violated O.C.G.A. § 16-14-4 when they committed, and conspired to commit (and conceal), the pattern of racketeering activity as set forth in Count Eight of this Complaint.

20297740 v3

141.

Defendants' violations of O.C.G.A. § 16-14-4 have directly and proximately caused injury and financial loss to LeCraw. Pursuant to O.C.G.A. § 16-14-6(c), LeCraw is entitled to recover three times the actual damages sustained, plus punitive damages, attorneys' fees, and costs of investigation and litigation reasonably incurred.

## COUNT TEN

## VIOLATIONS OF THE GEORGIA FAIR BUSINESS PRACTICES ACT

142.

LeCraw incorporates all of the allegations set forth above as if fully set forth herein.

143.

The representations (and omissions) of Defendants in connection with Defendants' sale of the Fake Wine to LeCraw constitute consumer transactions and consumer acts or practices in trade or commerce within the meaning of O.C.G.A. § 10-1-393(a).

144.

Defendants made representations to LeCraw that they had inspected the wine and determined that the wine was authentic. Defendants' representations that the wine was authentic and the sales of the Fake Wine to LeCraw constituted unfair or deceptive acts or practices within the meaning of O.C.G.A. § 10-1-393, because, among other reasons:

46

(1) said representations were false, intentional, and misleading concerning the authenticity and provenance of the Fake Wine; and (2) said representations were designed to mislead and induce LeCraw into purchasing the Fake Wine. Specifically, Defendants knowingly represented that the Fake Wine was genuine when knowing it was counterfeit.

145.

More than 30 days prior to the assertion of the claims made herein, LeCraw furnished a written demand for relief as required by O.C.G.A. § 10-1-399.

146.

LeCraw has been damaged as a result of Defendants' misrepresentations, false advertising and violation of Georgia law.

147.

Defendants' conduct giving rise to this litigation is intentional and egregious, entitling LeCraw to recover treble damages and exemplary damages.

**COUNT ELEVEN**

**BREACH OF CONTRACT (CONSIGNED WINE)**

148.

LeCraw incorporates all of the allegations set forth above as if fully set forth herein.

149.

In 2010, Defendants took delivery of numerous bottles of LeCraw's wine to sell on consignment.

150.

Defendants have not paid LeCraw for all of the Consigned Wine.

151.

After LeCraw made demand for an accounting of all the Consigned Wine and Defendants' sales of same, Defendants admitted that they have not paid LeCraw for all of the Consigned Wine.

152.

LeCraw has demanded an accounting and payment for all of the Consigned Wine which has been sold but Defendants have refused.

153.

Defendants are in breach of their contract to pay LeCraw for the Consigned Wine upon the sale of each of the bottles of Consigned Wine.

154.

Defendants are liable, jointly and severally, for their breach of contract with respect to the Consigned Wine, in an amount to be determined at trial, plus pre-judgment interest from each of the sales of Consigned Wine.

20297740 v3

## COUNT TWELVE

## ACCOUNTING (CONSIGNED WINE)

### 155.

LeCraw incorporates all of the allegations set forth above as if fully set forth herein.

### 156.

In 2010, Defendants took numerous bottles of LeCraw's wine to sell on consignment.

### 157.

Defendants paid LeCraw for some, but not all of the Consigned Wine.

### 158.

LeCraw has requested on numerous occasions that Defendants provide LeCraw

with an inventory and accounting of all of the bottles of the Consigned Wine.  Defendants refuse to do so.

### 159.

LeCraw has no information about Defendants' sales of the Consigned Wine, when the bottles were sold, to whom the bottles were sold, or what prices were paid to Defendants for the Consigned Wine.

49

160.

LeCraw is entitled to an accounting of all of the Consigned Wine including each sale of the Consigned Wine, the identities of each of the buyers of the Consigned Wine, the date of each sale, the purchase price received by Defendants for each bottle, and all payments received by Defendants for the Consigned Wine.

161.

LeCraw is entitled to all proceeds of the sales of the Consigned Wine, plus prejudgment interest, minus commissions of 10% of the sale prices, and minus the payments received by LeCraw.

162.

If any of the sales of Consigned Wine were not legitimate, arms-length sales to bona fide purchasers, then LeCraw is entitled to the current value of each bottle for each such sale.

## COUNT THIRTEEN

## CONVERSION

163.

LeCraw incorporates all of the allegations set forth above as if fully set forth herein.

164.

Defendants have wrongly exercised dominion over LeCraw's property in denial of his rights.   According to Defendants' website, the Consigned Wines are being sold through AWC Global.

165.

Defendants converted the Consigned Wine and/or the payments for same. Defendants were required to sell the Consigned Wine to bona fide, arm's length purchasers and remit the proceeds to LeCraw after deducting a 10% commission.

166.

Defendants have admitted selling bottles of Consigned Wine for which they have failed to pay LeCraw, although Defendants refuse to identify what bottles for which they have failed to pay LeCraw.   On information and belief, because Defendants refuse to provide basic information about the sales of LeCraw's Consigned Wine, Defendants have sold bottles of the Consigned Wine for prices less than fair market value, or for prices greater than what they will acknowledge to LeCraw.

167.

LeCraw has made demand upon Defendants to pay him the funds received from legitimate, arm's-length sales of his Consigned Wine (minus commissions), but Defendants have failed and refused to pay LeCraw or account for each of the bottles.

Therefore, Defendants are liable, jointly and severally, for conversion in an amount to be determined at trial, plus pre-judgment interest and punitive damages.

## COUNT FOURTEEN

## BREACH OF FIDUCIARY DUTY/BREACH OF TRUST (CONSIGNED WINE)

168.

LeCraw incorporates all of the allegations set forth above as if fully set forth herein.

169.

Defendants were and are in possession of, and control the Consigned Wine and LeCraw's money from the sales of Consigned Wine.

Defendants held and still hold LeCraw's Consigned Wine and sales proceeds from the Consigned Wine in trust for LeCraw's benefit.

170.

Defendants owe fiduciary duties to LeCraw with respect to the Consigned Wine.

171.

Defendants had and have the duty to LeCraw to account to LeCraw for all of the Consigned Wine and all sales of Consigned Wine.  Defendants also had and have an

affirmative duty to LeCraw to communicate directly with him with respect to all matters pertaining to the Consigned Wine and sales thereof.

172.

Defendants breached their fiduciary duties and breached their trust to LeCraw by, *inter alia*, engaging in the aforementioned conduct including their admitted failure to pay LeCraw for some of the Consigned Wine, their conversion of the Consigned Wine and/or the payments for same, their refusal to account to LeCraw for the Consigned Wine and failure to notify LeCraw of sales of the Consigned Wine, and/or by selling bottles of the Consigned Wine for prices less than fair market value, or for prices greater than what they will acknowledge to LeCraw.

173.

Defendants acted in bad faith and defrauded LeCraw in violation of their fiduciary duties.

174.

Defendants' breaches of fiduciary duties and trust in connection with the Consigned Wine actually and proximately caused LeCraw damages for which Defendants are liable, jointly and severally, in an amount to be determined at trial, plus pre-judgment interest and punitive damages.

20297740 v3

## COUNT FIFTEEN

## PUNITIVE DAMAGES

### 175.

LeCraw incorporates all of the allegations set forth above as if fully set forth herein.

### 176.

Defendants' conduct described herein demonstrates their willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to the consequences in violation of O.C.G.A. § 51-12-5.1.

### 177.

Moreover, Defendants' conduct was repeated and systemic which evidences their specific intent to harm LeCraw.  Defendants realized that LeCraw would rely on their expertise and opinions about wine to purchase fake wine from Defendants upon their recommendation.  This included what was then the most expensive bottle of white wine ever sold – the 1787 d'Yquem.  Defendants had LeCraw purchase the 1787 d'Yquem to obtain a windfall profit and to publicize the sale for Defendants' gain.

20297740 v3

178.

Counterfeit wine has become a major problem worldwide.  News accounts continue to appear on counterfeit wine around the world.  The counterfeit wine trade cannot exist without fine wine merchants and auction houses to place the wine into the stream of commerce and give an artificial stamp of approval to lend credibility to each fake bottle.  Merchants like Defendants should be the best filter to keep counterfeit wine out of the market.  But Defendants found a way to profit from wine fraud at LeCraw's expense.

179.

Merchants like Defendants also can cause the counterfeit wine market to flourish by giving credibility to fake wine.  Defendants gave their stamp of approval on all of the Fake Wine sold to LeCraw thereby allowing it to be placed into the stream of international commerce.  LeCraw has stopped the Fake Wine in his cellar from victimizing any other wine investors, but LeCraw has paid a substantial price to remove the Fake Wine from the stream of commerce, all of which Defendants profited from.

180.

Defendants should be punished for each of their intentional acts of fraud and/or utterly gross negligence in selling the Fake Wine to LeCraw.  Defendants helped promote the counterfeit wine industry and profited from it to LeCraw's detriment.

181.

Defendants' actions demonstrate a specific intent to harm LeCraw and LeCraw is entitled to an award of punitive damages in an amount not less than $25 million to punish Defendants for their fraud and deter Defendants from victimizing other wine collectors and investors.

## COUNT SIXTEEN

## ATTORNEY'S FEES

182.

LeCraw incorporates all of the allegations above as if fully set forth herein.

183.

Prior to filing suit, LeCraw demanded that Defendants pay LeCraw for the Fake Wine and take back and destroy the Fake Wine.  Defendants denied the Fake Wine is counterfeit and refused to take it back or compensate LeCraw.

184.

LeCraw has also demanded an accounting of all of the Consigned Wine, including all of the documentation of sales of the Consigned Wine and payments to LeCraw for same.  Defendants acknowledged owing LeCraw money from the Consigned Wine, but have refused to account for any sales of Consigned Wine.

185.

Defendants have been stubbornly litigious, acted in bad faith and with malice in all of their transactions with LeCraw described above.

186.

Defendants' stubborn litigiousness and bad faith have caused LeCraw unnecessary trouble and expense, including the costs of authenticating the Fake Wine with Ms. Downey and the chateaux, the expenses of this litigation, and attorney's fees.

187.

Defendants are liable, jointly and severally, for all of LeCraw's expenses actually incurred in this matter, including his attorney's fees, under O.C.G.A. § 13-6-11.

WHEREFORE, LeCraw prays for the following relief:

(a)    That process issue and be served upon Defendants as provided by law;

(b)    That LeCraw have a trial by jury on all claims so triable;

(c)    That the Court enter judgment in favor of LeCraw for actual, incidental, consequential, and treble damages, in an amount to  be  determined  at  trial, plus prejudgment interest;

(d)    For an award of punitive damages against Defendants, jointly and severally, in an amount to be determined by the enlightened conscience of a fair and impartial jury, but not less than $25 million;

57

(e)   An award of LeCraw's expenses actually incurred in this matter, including his attorney's fees under O.C.G.A. § 13-6-11; and

(f)   For such other and further relief for LeCraw as this Court deems just and proper in the circumstances.

Respectfully submitted this 17th day of April, 2014.

s/John O'Shea Sullivan
John O'Shea Sullivan
Georgia Bar No. 691305
ssullivan@burr.com
Bret A. Beldt
Georgia Bar No. 940327
bbeldt@burr.com

Attorneys for Plaintiff Julian LeCraw, Jr.

**BURR & FORMAN LLP**
171 Seventeenth Street, N.W.
Suite 1100
Atlanta, Georgia  30363
Telephone: (404) 815-3000
Facsimile: (404) 817-3244

58

## CERTIFICATION OF COUNSEL

I hereby certify that the foregoing **COMPLAINT** has been prepared with Times New Roman, 14 point font, one of the font and point selections approved by the Court in LR 5.1B.

s/John O'Shea Sullivan
John O'Shea Sullivan
Georgia Bar No. 691305
ssullivan@burr.com

**BURR & FORMAN LLP**
171 Seventeenth Street, N.W.
Suite 1100
Atlanta, Georgia 30363
Telephone: (404) 815-3000
Facsimile:  (404) 817-3244

20297740 v3