**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

JULIAN LECRAW, JR.,       :
                                  :
      Plaintiff,           :
                                    :
v.                              :     CIVIL ACTION NO.
                              :     1:14-CV-01149-RWS
THE ANTIQUE WINE     :
COMPANY (FRANCHISING)  :
LIMITED, *et al.*,         :
                                    :
      Defendants.       :
                                    :

## <u>ORDER</u>

This case comes before the Court on Defendants' Motion to Dismiss Based on *Forum Non Conveniens* [7], Defendants AWC Global and AWC Holdings' Motion to Dismiss for Lack of Personal Jurisdiction [8], Defendants' Motion to Dismiss for Failure to State a Claim [9], Defendants' Conditional Motion for Leave to Amend [21], and Plaintiff's Motion to Strike or Disregard Supplemental Declarations [31].  After reviewing the record, the Court enters the following Order.

## Background

This action arises out of Defendants' alleged sales of counterfeit bottles of vintage wine to Plaintiff Julian LeCraw, Jr., and Defendants' failure to pay Plaintiff for their consignment sales of other bottles of Plaintiff's wine. Plaintiff collects fine and rare wine and has purchased numerous bottles from Defendants.  (Compl., Dkt. [1] ¶ 13.)  Defendant Stephen Williams is the founder, CEO, and managing director of the Antique Wine Company.  Plaintiff names three related entities in this suit: the Antique Wine Company (Franchising) Limited, the Antique Wine Company (Holdings) Limited, and AWC Global PLC.

Defendants are based in London and operate offices in London, Hong Kong, and the Philippines, supplying fine wine through the global wine trade to private individuals, hotels, and restaurants.  (Id. ¶¶ 14-15.)  Defendants represent that they are the "leading fine wine merchant actively championing wine authentication."  (Id. ¶ 19.)  To that end, Defendants sponsor the CEBG Bordeaux Centre for Nuclear Studies in Bordeaux, France, which researches "fine wine provenance with ion beam analysis to verify the age of the glass bottles and wine contained therein."  (Id.)

2

As summarized below, Plaintiff's allegations center around (1) Plaintiff's purchase of counterfeit wine from Defendants and (2) Defendants' consignment sales of Plaintiff's wine.

## I.      Plaintiff's Purchase of the Counterfeit Wine

Plaintiff began purchasing rare vintage wine from Defendants in the early 2000s.  (Id. ¶ 21.)  In 2006, Plaintiff purchased a 1787 Chateau d'Yquem (1787 d'Yquem) white wine for over $90,000, apparently the most expensive white wine in the world.  (Id. ¶¶ 20, 22.)  Williams personally delivered the 1787 d'Yquem to Plaintiff's home in Atlanta, Georgia, flying from London to Atlanta on a private jet.  (Id. ¶ 27.)  Williams also provided Plaintiff with a leather notebook containing a letter signed by Williams dated February 9, 2006, which describes the history and provenance of the 1787 d'Yquem.  (Id. ¶ 25.)  The letter noted that in the twentieth century, one of France's most famous wine merchants owned the bottle until it was returned to Chateau d'Yquem upon his death in 1953.  (Dkt. [1-1] at 2-3.)  It was re-corked in 1980 by a retired staff member at the chateau, and it was re-corked again in 1994 when the head of the wine warehouse at the chateau attached an authenticity ticket to the bottle that

3

was signed by the Count at the time and verified that "as a matter of course, the wine in this bottle was under no circumstances tasted."  (Id. at 3.)

Between March and June 2006, Defendants sold Plaintiff twelve bottles of Chateau Lafite Rothschild dating from between 1784 and 1906 ("the Lafites").  (Compl., Dkt. [1] ¶ 29.)  In January 2006, Defendants sold Plaintiff a 1908 Chateau Margaux ("1908 Margaux"), which Defendants claimed to have purchased at a castle in Austria.  (Id. ¶ 30.)  Plaintiff also notes that he purchased a bottle of 1847 Chateau d'Yquem ("1847 d'Yquem") after October 2007, and Defendants placed a sticker on the bottle representing that Defendants and the chateau had inspected the bottle in October 2007.  (Id. ¶ 31.)

In 2013, a wine merchant visited Plaintiff's cellar to determine if he wished to purchase some of Plaintiff's bottles or offer them at auction.  (Id. ¶ 32.)  The merchant questioned the authenticity of the 1787 d'Yquem and other bottles, including some of the Lafites, and recommended that Plaintiff have a wine-authentication expert inspect some of the bottles in his collection.  (Id. ¶ 32.)

4

In March 2013, Plaintiff hired Maureen Downey, a well-known wine-authentication expert from San Francisco, California, to inspect some of the bottles.  (Id. ¶ 33.)  Downey and her photographer spent two full days inspecting and photographing the bottles before determining that some of them were counterfeit.  (Id. ¶ 35.)  Downey issued a report in June 2013 opining that all of the Lafites, the 1908 Margaux, the 1847 d'Yquem, and the 1787 d'Yquem were all counterfeit.  (Id. ¶ 36.)  According to Downey, some labels on the bottles were printed by a computer, while other bottles had excess glue around the labels which could not have been used by the chateaux.  (Id. ¶ 37.)  She also observed other signs of counterfeiting in the corks, the sediment inside the bottle, the shape and color of the bottle, and the color of the wine.  (Id.)

Plaintiff confronted Defendants with this evidence, but Defendants denied that the bottles were fake.  (Id. ¶ 40.)  To seek more definitive proof, Plaintiff had some of the wine taken to two chateaux in France from which the bottles originated.  (Id.)  On March 19, 2014, senior management of the Chateau d'Yquem in Sauternes, France, inspected the 1787 and 1847 d'Yquem. (Id. ¶ 41.)  They concluded that the bottles were not authentic.  (Id.)  On March 20, 2014, senior management of the Chateau Lafite Rothschild in Pauillac,

5

France, inspected several of the Lafite bottles.  (Id. ¶ 42.)  Those, too, were

determined to be fake.  (Id. ¶ 43.)  As for the 1908 Margaux, Plaintiff decided

not to transport it to France because of its large size (6 liters) and because he

was confident it was counterfeit.  (Id. ¶ 44.)

Plaintiff alleges, "Williams and his companies told [Plaintiff] that each of

the bottles of Fake Wine was authentic and genuine, but as fine and rare wine

experts who supposedly researched and guaranteed the provenance and histories

of each bottle sold, they knew that all of the Fake Wine was counterfeit when

they sold it to Plaintiff."  (Id. ¶ 46.)  Plaintiff argues that experts like

Defendants would have known that numerous irregularities in corks and tags

used on the Lafites meant that the bottles were not actually re-corked at the

Chateau Lafite Rothschild.  (Id. ¶¶ 48-51.)  In addition, Defendants placed their

own sticker on the 1847 d'Yquem stating they had presented the bottle to Count

Alexandre Lur-Saluces of Chateau d'Yquem for inspection in October 2007.

(Id. ¶ 52.)  But Chateau d'Yquem has apparently confirmed that Count Lur-

Saluces left the chateau in 2004 and could not have inspected the bottle in 2007.

(Id.)  Thus, Plaintiff argues Defendants must have known it was counterfeit.

AO 72A
(Rev.8/82)

## II.     Defendants' Consignment Sales of Plaintiff's Wine

Plaintiff's remaining allegations focus on an agreement between the parties for Plaintiff to consign a number of his bottles to Defendants for them to sell.  Plaintiff alleges that Defendants have only paid him a fraction of the value of the consigned wine that Defendants sold.  (Id. ¶ 62.)  Plaintiff has demanded an inventory and accounting of the consigned wine, but so far Defendants have refused.  (Id. ¶ 63.)

As discussed more fully below, Defendants argue that they entered into a written Broking Agreement with Plaintiff under which Defendants purchased $500,000 worth of wine from Plaintiff outright and agreed to sell other bottles for a commission.  Included in that agreement is a forum-selection clause under which the parties "irrevocably submit to the exclusive jurisdiction of English Courts for the determination of disputes arising under this Agreement." (Broking Agreement, Dkt. [7-14] at 3.)  Furthermore, Defendants submit copies of e-mails and other evidence that they sold most of Plaintiff's consigned wine and remitted to him $658,855.  (Williams Decl., Dkt. [7-2] ¶ 54.)  Plaintiff denies ever agreeing to the Broking Agreement, which he did not sign.

7

Plaintiff filed this action on April 17, 2014.  Plaintiff's claims include breach of contract, breach of express and implied warranties, fraud, conspiracy to defraud, negligent misrepresentation, violations of both the Georgia and Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), violations of the Georgia Fair Business Practices Act, conversion, and breach of fiduciary duty.

Defendants seek dismissal based on *forum non conveniens* and for failure to state a claim.  In addition, Defendants Antique Wine Company (Holdings) Limited and AWC Global PLC seek dismissal based on lack of personal jurisdiction.

## Discussion

## I.      Motion to Strike [31]

Before analyzing Defendant's motions, the Court addresses Plaintiff's Motion to Strike or Disregard Supplemental Declarations [31] contained in Defendants' reply brief supporting their *forum non conveniens* motion.  The supplemental declarations pertain to (1) the Broking Agreement and (2) European witnesses as potential third-party defendants.

8

Defendants' motion to dismiss relies in part on a forum-selection clause in the alleged Broking Agreement.  (See infra Part II.B.1.)  In response to Defendants' motion, Plaintiff disagreed that he ever entered into or signed the Broking Agreement, and he denied ever agreeing to litigate in English courts. Defendants then submitted additional declarations with their reply brief supporting their belief that Plaintiff agreed to the proposed Broking Agreement.

The Federal Rules of Civil Procedure provide that "[w]hen a motion is supported by affidavit, the affidavit shall be served with the motion."  FED R. CIV. P. 6(d).  The Local Rules also state: "Every motion presented to the clerk for filing shall be accompanied by a memorandum of law which cites supporting authority.  If allegations of fact are relied upon, supporting affidavits must be attached to the memorandum of law."  LR 7.1(A)(1), ND Ga.  Courts consider reply affidavits only for the "limited purpose of responding to matters raised in the responses filed by the opposing parties." Tischon Corp. v. Soundview Commc'ns, Inc., No. 1:04-CV-524-JEC, 2005 WL 6038743, at *8 (N.D. Ga. Feb. 15, 2005).

Plaintiff argues that the submission of new declarations was improper because the same witnesses had already submitted declarations with the original

9

motion.  Defendants assert that their supplemental declarations rebut specific points Plaintiff brought up in his response, and that the e-mail exhibits were all e-mails sent to or received by Plaintiff, which he had access to.  (Id. at 5-6.)

Plaintiff cites Tischon Corp. v. Soundview Communications, Inc., in which the court held, "Justice is not served by allowing a moving party to unfairly surprise and prejudice the non-movant by producing evidence of new, substantive facts at the last minute when there is no opportunity for the non-movant to respond."  2005 WL 6038743, at *8.  But the court also noted that it would be appropriate to consider affidavits when they are "submitted, specifically, for the limited purpose of responding to matters raised in the responses filed by the opposing parties."  Id.

That was the case in Cartel Asset Management, Inc. v. Altisource Portfolio Solutions, S.A., where the plaintiff moved to strike a defendant's supplemental affidavits showing it was not subject to personal jurisdiction in Georgia.  No. 1:11-CV-2612-TWT, 2012 WL 39559, at *3 (N.D. Ga. Jan. 6, 2012).  The plaintiff argued that because the defendant "broached the issue of personal jurisdiction, [the defendant] should have addressed this evidence in affidavits attached to its Motion to Dismiss because the additions in [the

10

defendant's] Reply Brief ultimately support the same conclusion that [the defendant] is not subject to personal jurisdiction in Georgia." Id.  But the court disagreed because it "d[id] not believe that the Defendant should have had to predict which evidence the Plaintiff would present and preemptively rebut it in affidavits attached to its Motion to Dismiss." Id.  Moreover, the supplemental affidavits were limited to rebutting the plaintiff's evidence.

Similarly, here Williams submitted an affidavit stating that the parties entered into the Broking Agreement on September 2, 2010.  (Williams Decl., Dkt. [7-2] ¶ 46.)  Williams described Defendants' performance of the Broking Agreement and the terms, and he attached a copy of the purported Broking Agreement as an exhibit.  (Dkt. [7-14].)  In response, Plaintiff explained in a declaration that he rejected and refused to sign the Broking Agreement. (LeCraw Decl., Dkt. [14-1] ¶ 32.)  According to Plaintiff, "I strongly disagreed with its terms, and I told Defendants that I rejected its terms and would not sign it." (Id.)  Defendants' reply in turn addressed these particular arguments with a declaration and exhibits of e-mails between Plaintiff and Williams in which Williams repeatedly sent the Broking Agreement to Plaintiff, and Plaintiff never voiced any objection to the agreement or its terms.  (See, e.g., Dkt. [25-3]; Dkt.

[25-4].)  Therefore, much like in <u>Cartel Asset Management</u>, Defendants' supplemental declaration directly responds to Plaintiff's evidence that he rejected the Broking Agreement and disagreed with its terms.  Even though Defendants first broached the topic, they were not required "to predict which evidence the Plaintiff would present and preemptively rebut it in affidavits attached to its Motion to Dismiss."  <u>See</u> <u>Cartel Asset Mgmt.</u>, 2012 WL 39559, at *3.

The second area of contention concerns the foreign wine merchants who, according to Defendants, sold them the alleged counterfeit wine and are potential third-party defendants.  (<u>See</u> Defs.' Reply, Dkt. [25] at 12-13.) Defendants say they made this argument to rebut Plaintiff's assertion that witnesses from the various chateaux were likely "friendly" to Defendants and would be cooperative during discovery.  (Defs.' Resp., Dkt. [33] at 6-7.) Defendants' argument that these witnesses could face liability therefore directly addresses matters raised in Plaintiff's response.  At any rate, as explained in Part II, <u>infra</u>, the Court does not find it necessary to factor this issue into its *forum non conveniens* analysis.  For these reasons, Plaintiff's Motion to Strike [31] is **DENIED**.

12

## II.   Motion to Dismiss Based on *Forum Non Conveniens*

Under the doctrine of *forum non conveniens*, a court has discretion to dismiss a case over which it otherwise has jurisdiction for reasons of convenience, fairness, and judicial economy.  See <u>Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.</u>, 549 U.S. 422, 429 (2007).  To obtain dismissal for *forum non conveniens*, "[t]he moving party must demonstrate that (1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice."  <u>Leon v. Millon Air, Inc.</u>, 251 F.3d 1305, 1310-11 (11th Cir. 2001).

### A.   <u>Availability and Adequacy of an Alternative Forum</u>

The Court must first examine whether an adequate alternative forum exists.  "Availability and adequacy warrant separate consideration."  <u>Id.</u> at 1311.

A forum is available "when the foreign court can assert jurisdiction over the litigation sought to be transferred."  <u>Id.</u>  "A defendant's submission to the jurisdiction of an alternative forum renders that forum available for the purposes of a *forum non conveniens* analysis."  <u>Bautista v. Cruise Ships</u>

13

Catering and Svc. Int'l, 350 F. Supp. 2d 987, 991 (S.D. Fla. 2004); see also

Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22 ("Ordinarily, this

requirement will be satisfied when the defendant is 'amendable to process' in

the other jurisdiction.").  Here, Defendants show that they are all residents of

England, and they have stipulated that they will make themselves amenable to

process as a condition of dismissal.  (See Defs.' Br., Dkt. [7-1] at 12.)  England

is thus available as a forum.

Next, in considering whether a foreign forum is adequate, the Supreme

Court noted in Piper Aircraft that dismissal may be improper "if the remedy

provided by the alternative forum is so clearly inadequate or unsatisfactory that

it is no remedy at all."  454 U.S. at 254.  "[I]t is only in 'rare circumstances'

where 'the remedy offered by the other forum is clearly unsatisfactory,' that the

alternative forum may be regarded as inadequate."  Aldana v. Del Monte Fresh

Produce, N.A., Inc., 578 F.3d 1283, 1290 (11th Cir. 2009) (quoting Satz v.

McDonnell Douglas Corp., 244 F.3d 1305, 1311 (11th Cir. 2001)).  Indeed,

courts have been reluctant to hold that an alternative forum is inadequate.  See

Leon, 251 F.3d at 1312.

14

To show that England is an adequate forum, Defendants produce a declaration by Giles Wheeler, an English barrister who states that English law provides Plaintiff a remedy for his claims.  (<u>See</u> Wheeler Decl., Dkt. [7-17].) Even though Plaintiff could not bring a RICO claim in English courts, Defendants note that a forum is not inadequate "solely because of the possibility of an unfavorable change in law."  <u>Piper Aircraft</u>, 454 U.S. at 249. Indeed, the Eleventh Circuit has concluded that the "inability to assert a RICO claim in the foreign forum does not preclude *forum non conveniens* dismissal." <u>Republic of Panama v. BCCI Holdings (Luxembourg) S.A.</u>, 119 F.3d 935, 952 (11th Cir. 1997).  Even if Plaintiff could not bring a RICO claim, in substance Plaintiff would have a remedy for claims related to both the counterfeit wine and the consigned wine.  (<u>See</u> Wheeler Decl., Dkt. [7-17] ¶¶ 10-11.)  Wheeler also explains which English causes of action would apply based on the conduct Plaintiff alleges.  These causes of action range from breach of contract and deceit to conspiracy and negligent misrepresentation.  (<u>See</u> <u>id.</u> ¶¶ 12-35.)

Plaintiff responds that England is not an adequate forum because Defendants did not demonstrate that English courts could properly apply Georgia law.  Moreover, Plaintiff says Defendants have even failed to show that

15

English law would apply to his claims if brought in English courts.  Without wading into these choice of law issues, the Court finds that English courts would serve as an adequate forum even if they were required to apply Georgia law.  While it is ideal for a jurisdiction to apply its own law, this factor alone does not render a foreign forum inadequate, for courts are frequently called upon to apply the law of other jurisdictions.  Plaintiff does not show that English courts are incompetent to apply Georgia law, and the Court presumes that they could.  Besides, the Eleventh Circuit has explained that "[a]n adequate forum need not be a perfect forum."  Satz, 244 F.3d at 1283.  Courts have even found that corruption or inefficiency may not be enough to show inadequacy unless a litigant can show "extreme amounts of partiality or inefficiency."  See Leon, 251 F.3d at 1312.  There is no evidence that English courts suffer from any of these deficiencies.  See, e.g., Exter Shipping Ltd. v. Kilakos, 310 F. Supp. 2d 1301, 1322 (N.D. Ga. 2004) (holding "that the United Kingdom is an adequate alternative forum available to the Plaintiffs"); In re Sherwood Invs. Overseas Ltd., 442 B.R. 834, 837 (M.D. Fla. 2010) (stating that "there is no question as to British courts' adequacy or availability").  Because English law provides adequate remedies for Plaintiff's causes of action, and because the

16

Court finds no reason to question the competence of English courts to interpret Georgia law in the event it applies, the Court finds that England is an adequate alternative forum.

> B.        Private and Public-Interest Factors

The next step of the inquiry is to balance private and public-interest factors.  As an initial matter, Defendants contend that the forum-selection clause in the Broking Agreement controls.  In <u>Atlantic Marine Construction Co. v. U.S. District Court for the Western District of Texas</u>, the Supreme Court explained that an enforceable forum-selection clause carries significant weight in the *forum non conveniens* analysis:

> When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation.  A court accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum. . . .
>
> As a consequence, a district court may consider arguments about public-interest factors only.  Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases.

134 S. Ct. 568, 582 (2013).[1]

---

[1]Although the Supreme Court decided <u>Atlantic Marine</u> in the context of a transfer motion under 28 U.S.C. § 1404(a), the Court noted that "the same standards

Furthermore, while a U.S. plaintiff's choice of his or her home forum typically carries with it "a strong presumption that the plaintiff has chosen a sufficiently convenient forum," Leon, 251 F.3d at 1314, "the plaintiff's choice of forum merits no weight" when the plaintiff has agreed to a valid forum-selection agreement, Atl. Marine, 134 S. Ct. at 581. Before the Court proceeds with the *forum non conveniens* analysis, it must decide whether the parties agreed to a valid forum-selection clause in the first place.

### 1.    Forum-Selection Clause

Defendants submit e-mails showing that the parties entered into the Broking Agreement on September 2, 2010. (Defs.' Reply, Dkt. [25] at 4; E-mails, Dkt. [25-5] at 2.) Under that agreement, Defendants purchased wine listed on Schedule 1 of the Broking Agreement for $500,000. (Williams Decl., Dkt. [7-2] ¶ 48; Broking Agreement, Dkt. [7-14].) On September 2, 2010, Plaintiff sent Williams wiring instructions for his U.S. bank account. (E-mails, Dkt. [25-5] at 2.) Williams responded with an attachment of "the purchase agreement signed by me reflecting our deal." (Id.) He also confirmed that he

---

should apply to motions to dismiss for *forum non conveniens* in cases involving valid forum-selection clauses pointing to state or foreign forums." 134 S. Ct. at 583 n.8.

18

would wire $500,000 to Plaintiff's account.  (Id.)  Defendants transferred

$500,000 to Plaintiff on September 3, 2010.  (Dkt. [25-2] at 2.)

About a month later, Williams e-mailed Plaintiff to tell him that a

representative from the Antique Wine Company would travel from London to

Atlanta to pick up a bottle of wine to sell.  (Dkt. [25-6] at 2.)  Williams again

attached a copy of the Broking Agreement.  Plaintiff responded by asking about

the conversion rate and asking why Defendants did not want to take some of his

other rare bottles.  (Id.)  His e-mail concluded: "I LOOK FORWARD TO

SEEING BERENGER [the Antique Wine employee] ON TUSDAY [sic]

MORNING."  (Id.)  Plaintiff made no mention of the Broking Agreement.

Williams and Plaintiff communicated over the following months.

Plaintiff inquired about the status of the wine sales and payment, and Defendant

sent updates about the consigned wines and confirmed payment.  (See, e.g.,

Dkt. [25-15]; Dkt. [25-14].)  In these e-mails, Plaintiff never objected to terms

of the Broking Agreement, even when Williams repeatedly sent Plaintiff copies

of it and continued to transfer money to him.  (See Dkt. [25-5, 25-6, 25-7, 25-

8].)  Even more telling, Plaintiff referenced the agreement in a July 2011 e-mail

to Williams: "COULD YOU PLEASE HAVE YOUR BOOK KEEPER TO

19

PUT TOGETHER A SCHEDULE THAT MATCHES UP WITH THE
SCHEDULE THAT WAS ATTACHED TO OUR AGREEMENT AND SHOW
WHAT HAS SOLD AND HAS NOT AND FOR WHAT PRICE?"  (Dkt. [25-
19] at 3.)

In contrast, Plaintiff does not back up his assertions that he never
assented to the Broking Agreement with any evidence other than his denials in
his declaration.  In light of these contemporaneous e-mails, Plaintiff's lack of
objection to the terms of the Broking Agreement when he received copies of it,
the fact that Defendants proceeded to sell wine while Plaintiff accepted
payment, and Plaintiff's reference to the agreement, the Court finds that
Plaintiff accepted the terms of the document, including the forum-selection
clause.  Even though Plaintiff did not sign the Broking Agreement, courts will
"enforce an unexecuted agreement if it appears that the parties have expressed
their assent.  In such a situation, the court is merely enforcing what the evidence
suggests was the intent of the parties."  Doll v. Grand Union Co., 925 F.2d
1363, 1370 (11th Cir. 1991) (citation omitted).  The evidence here demonstrates
that Plaintiff assented to the Broking Agreement, as well as to "irrevocably
submit to the exclusive jurisdiction of English Courts for the determination of

20

disputes arising under this Agreement." (Broking Agreement, Dkt. [7-14] at 3.)[2]

Having found that the parties agreed to a forum-selection clause, the Court must evaluate whether the clause is valid and enforceable. Forum-selection clauses are presumptively valid and enforceable. See, e.g., M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972). "Only under extraordinary circumstances unrelated to the convenience of the parties" should a court decline to enforce a forum-selection clause. Atl. Marine, 134 S. Ct. at 581. As the Supreme Court has explained, a forum-selection clause "represents the parties' agreement as to the most proper forum." Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 31 (1988). To defeat enforcement of a forum-selection clause, a plaintiff must make "a 'strong showing' that enforcement would be

---

[2]Plaintiff argues that even if he agreed to the forum-selection clause, the clause no longer applies because the Broking Agreement provides that all obligations under the agreement cease following the expiration of the exclusivity period (during which Antique Wine was granted an option to purchase the consigned wines for a period of 180 working days). (Dkt. [7-14] ¶ 9.) But under the agreement, the parties *irrevocably* agreed to litigate disputes related to the agreement in English courts. Moreover, "a forum selection clause survives termination of the contract" unless contractual language expressly or impliedly indicates otherwise. Advent Elec., Inc. v. Samsung Semiconductor, Inc., 709 F. Supp. 843, 846 (N.D. Ill. 1989). There is no reason to believe that the parties only intended for the forum-selection clause to apply for 180 days.

unfair or unreasonable under the circumstances." Krenkel v. Kerzner Int'l

Hotels Ltd., 579 F.3d 1279, 1281 (11th Cir. 2009).  In that regard, such clauses

are unreasonable when:

> (1) their formation was induced by fraud or overreaching; (2) the plaintiff effectively would be deprived of its day in court because of the inconvenience or unfairness of the chosen forum; (3) the fundamental unfairness of the chosen [forum] would deprive the plaintiff of a remedy; or (4) enforcement of such provisions would contravene a strong public policy.

Lipcon v. Underwriters at Lloyd's, London, 148 F.3d 1285, 1296 (11th Cir.

1998).

Plaintiff has made no such showing.  There is no evidence of fraud or

overreaching.  There is no evidence that enforcing the clause would effectively

deprive Plaintiff of his day in court or a remedy, even though it would require

more time and expense to litigate in England.  Finally, the Court finds that

enforcing the clause in this situation would not contravene public policy.

Because the Court finds that a valid forum-selection clause controls, Plaintiff's

choice of forum is given no deference, and the Court is required to find that the

private-interest factors favor England.[3]  See GDG Acquisitions, LLC v. Gov't

---

[3]The private factors include: "ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance

of Belize, 749 F.3d 1024, 1029 (11th Cir. 2014) ("A binding forum-selection clause requires the court to find that the *forum non conveniens* private factors entirely favor the selected forum.").

### 2.    *Public-Interest Factors*

The next step is to weigh the public-interest factors.  Public-interest factors may include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." Piper Aircraft, 454 U.S. at 241 n.6 (internal quotation marks omitted).

Defendants argue that this case warrants dismissal based on public-interest factors because (1) English law applies to this case, (2) England has a significant interest in the case, and (3) administrative burdens on the Court

_____

of willing, witnesses . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947).

favor dismissal.  (<u>See</u> Defs.' Br., Dkt. [7-1] at 15-19.)  Plaintiff disagrees with each of these points.  (<u>See</u> Pl.'s Resp., Dkt. [14] at 23-27.)

"[T]he need to apply foreign law points towards dismissal."  <u>Piper Aircraft</u>, 454 U.S. at 259.  Still, "this factor cannot be accorded dispositive weight."  <u>SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.</u>, 382 F.3d 1097, 1105 (11th Cir. 2004).  It is not immediately clear whether English law or Georgia law applies in this case.  It appears from the Broking Agreement that the place of performance was England, where Defendants arranged sales of the consigned wine.  Defendants argue that English law therefore applies because when "the contract is made in one state and is to be performed in another state, the substantive law of the state where the contract is performed will apply."  <u>Amstell, Inc. v. Bunge Corp.</u>, 443 S.E.2d 706, 707 (Ga. Ct. App. 1994) (holding that while a contract was executed in another state, Georgia law applied because the contracts were to be performed by a corporation located in Georgia).  But, there is a possibility that English courts would have to apply Georgia law as well, at least with respect to the wine-fraud claims.  Therefore, the Court places little weight on this factor.

24

Next, the Court finds that both Georgia and England have an interest in this case.  Georgia surely has an interest in trying claims of a citizen alleging fraud, breach of contract, and other statutory claims based on alleged misconduct by a foreign business.  In addition, the Court does not find a Georgia jury would be burdened by hearing this case because it is not entirely unrelated to this forum.  On the other hand, England, too, has an interest in trying claims of wrongdoing brought against an English company doing business there and in other European Union member states.  The Court finds that the relative interests of the fora do not clearly point to one forum or the other, so this factor does not weigh in favor of either one.

The administrative burdens on this Court, however, do favor dismissal.  Due to the Court's heavy caseload, dismissing this case in favor of an English forum will save the Court resources that would have to be expended in overseeing a case involving foreign discovery and choice of law issues.  While the wine itself is in Georgia, much of the evidence related the wine's previous ownership and handling is in Europe, as described in the Background section.  The Court's ability to resolve discovery disputes involving witnesses or documents in Europe, for example, would be hampered.

25

The Court also notes that, while the forum-selection clause in the Broking Agreement applies only to the claims arising from that agreement, it is far better for the Court to dismiss the entire case so that the wine-fraud claims can be tried alongside the breach of contract claims in one forum.  For reasons of judicial economy, it would be better for English courts to hear all of these claims rather than to break off the breach of contract issue and have the same parties pursue separate cases in two jurisdictions thousands of miles apart.  Both fora would be better served to have these efforts consolidated rather than for each to adjudicate issues and oversee discovery that will partially overlap.  Furthermore, even if the Court tried these claims in Georgia, Plaintiff likely would have to enforce any judgment in England because Defendants do not appear to have any assets in the United States.  (See Defs.' Br., Dkt. [7-1] at 4.)  Again, judicial economy favors a forum that can handle all matters related to this case.  Taking these administrative factors together, the Court finds that the administrative burdens favor dismissal.

After considering the public-interest factors, the Court finds that they tilt in favor of England.  In short, Plaintiff has not succeeded in showing "extraordinary circumstance unrelated to the convenience of the parties" that

26

justify denying Defendants' motion when a valid forum-selection clause

requires litigation in English courts.  See Atl. Marine, 134 S. Ct. at 581.

Consequently, because both the private and public-interest factors weigh in

favor of litigating this case in English courts, the Court finds that this case

should be dismissed for *forum non conveniens*.

> 3.   *Plaintiff's Ability to Reinstate His Suit Without Undue Inconvenience or Prejudice*

For the last factor, the Court must ensure that a plaintiff can reinstate his

suit without undue inconvenience or prejudice.  As previously noted,

Defendants have agreed to accept service in England as a stipulation of

dismissal, so Plaintiff would have the ability to reinstate his suit in England.

See Barilotti v. Island Hotel Co., No. 13-23672-CIV, 2014 WL 1803374, at *10

(S.D. Fla. May 6, 2014) (finding that defendant's waiver of defenses related to

statutes of limitation, venue, or jurisdiction ensured that plaintiffs could

reinstate their suit without prejudice).  But Plaintiff argues that it would be

extremely inconvenient and costly for him to litigate in English courts.  Given

that a valid forum-selection clause controls here, however, these factors cannot

justify denying Defendant's motion.  Accordingly, Defendants' Motion to
Dismiss Based on *Forum Non Conveniens* [7] is **GRANTED**.

### Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss Based on
*Forum Non Conveniens* [7] is **GRANTED** subject to Defendants' acceptance of
service in English courts.

Furthermore, Defendants AWC Global and AWC Holdings' Motion to
Dismiss for Lack of Personal Jurisdiction [8], Defendants' Motion to Dismiss
for Failure to State a Claim [9], and Defendants' Conditional Motion for Leave
to Amend [21] are **DENIED as moot**.  Finally, Plaintiff's Motion to Strike or
Disregard Supplemental Declarations [31] is **DENIED**.

**SO ORDERED**, this   19th   day of March, 2015.


_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

28